BURKHAM v. The L. J. FARWELL. See Case No. 8,426.

## Case No. 2,161.
### BURKE v. The M. P. RICH.
[1 Cliff. 308.] [1]
### Circuit Court, D. Massachusetts. Oct. Term, 1859.

BOTTOMRY—WHAT NECESSITIES MUST EXIST—FOREIGN PORT—THE LIEN — HOW LOST—RIGHTS OF ASSIGNEE—ENFORCEMENT BY ASSIGNEE.

1. Semble. Although the assignee of a bottomry bond may maintain a suit in admiralty in his own name, yet he may also sue in the name of his assignor. *Held*, that a suit brought in the name of the assignor will be maintained where the real parties in interest appeared in the progress of the suit and filed a supplemental libel, which was answered by the respondent, and then the parties proceeded to issue and trial.

2. There must be a twofold necessity for raising money to justify a master in raising it on bottomry; there must be a necessity of obtaining repairs or supplies, in order to prosecute the voyage; and there must be a necessity of resorting to this method to obtain the money, from inability to procure the required funds in any other way.

[Cited in Insurance Co. v. Gossler, 96 U. S. 649.]

[See Walden v. Chamberlain, Case No. 17,055; The Eledona, Id. 4,341; The Grapeshot, 9 Wall. (76 U. S.) 129; The Washington Irving, Case No. 17,244; Thomas v. Gittings, Id. 13,897; The Lady Franklin, Id. 7,982.]

3. Hypothecation of the vessel can only be made in a foreign port; but in the jurisprudence of the United States all maritime ports, other than those of the state where the vessel belongs, are foreign to the vessel.

[Cited in The Albany, Case No. 131; The General Burnside, 3 Fed. 228.]

[See note at end of case.]

4. Although it is true that proceedings on a bottomry bond must be instituted within a reasonable time, yet the maritime law will not suffer the lien to be affected by the mere departure of the vessel from the return port, with or without the knowledge of the holder of the bond.

5. Where an assignee of a bottomry bond took a mortgage of the vessel on which the bond was given, to secure money loaned, but it did not appear that any of the money was included in the mortgage for the payment of the bond, *held*, that his rights were not affected.

[See Johnson v. The Belle of the Sea, Case No. 7,372.]

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

In admiralty. This was an appeal from a decree of the district court [of the district of Massachusetts (case unreported)] in a cause of bottomry. It was a suit in rem, instituted by the appellant [John Burke] to recover the amount of a certain bottomry bond upon the brig [M. P. Rich], given by the master. [There was a decree in favor of the claimants, George H. Blanchard and others, and the libellant appealed. Reversed.]

The vessel sailed from New York for the port of Darien in the state of Georgia, thence to Gaudaloupe in the West Indies, thence to return to New York; but in consequence of disasters was compelled to put into the port of Savannah for repairs, where the master was obliged to resort to a loan on bottomry to obtain the necessary funds. Thereupon, pursuant to an agreement with the master that he would give him such a bond, the libellant advanced eleven hundred dollars to repair the vessel. The bond was dated December 11, 1857. Payment was to be made within five days after the arrival of the vessel at New York, and more than that time having elapsed, the libellant claimed to recover seventeen hundred dollars, according to the conditions and terms of the bond. The answer set up that the vessel, after being repaired, proceeded on her intended voyage, and when completed she returned to the port of Savannah, where the bond and claim of libellant were fully satisfied by the agent of the vessel. As a further defence, it was alleged that the vessel subsequently made another voyage from Savannah to Havana and other West India ports, and thence to New York, and that the master, who was then a part owner, conveyed to the claimants one quarter of the vessel, before she sailed for Boston. It was also averred that the suit was being prosecuted by certain part owners for their own benefit, in fraud of the claimants' rights.

The libellant filed a supplemental libel, in which it was denied that the bond was ever paid, and alleged that the amount paid by Charles and J. Peters was advanced by them, not as agents of the vessel, but at the request of Howland, Hinckley, & Co., who were not, and had never been, owners, but only mortgagees of a portion of the vessel; that the advance was made on joint account of all those parties to save the vessel from arrest; that the assignment was made for the parties first named for the security of all of them; and that Howland, Hinckley, & Co. subsequently paid the whole amount when the bond was assigned to them for the entire sum, and that this suit, though in the name of the libellant, is prosecuted for their sole interest and benefit. To the other grounds of defence set up in the answer, the libellant pleaded that the transfer of one quarter of the vessel to the claimants, if any such was made, was not absolute, but only collateral, on account of a pre-existing debt, and was made with full knowledge on their part that

the bond still existed in full force, and was still due and unpaid, and to be enforced. In their answer to the supplemental libel, the claimants alleged that the supposed assignees received a bill of sale of five eighths of the vessel, in consideration, among other things, of the payment of the amount of the bond, and that the pretended assignment was a fraud upon the claimants. They also denied that the bill of sale was a mortgage, but averred that it was absolute on its face, and that the supposed mortgagees held themselves out to be owners of five eighths of the vessel. Howland, Hinckley, & Co. also filed a supplemental libel, alleging that they never received a bill of sale of any part of the vessel except as follows: the owners of the vessel being indebted to them in the sum of thirty-seven hundred dollars on account, the libellants, on May 1, 1858, or about that time, sent to the agent of the owners a bill of sale to be executed by the owners to them, with the view to secure that sum and certain other sums due from the owners to certain other creditors, amounting to $4,500. The bill of sale was executed for that purpose, but was accompanied by a bond of defeasance, executed by them, and designed to be delivered to the owners at the same time; and it was delivered to the owners, and was by them retained. In this libel, it was also alleged that the bond to them was bona fide, and for a valuable consideration, and it was denied that its prosecution was a fraud upon the claimants. To all these allegations, the claimants filed another answer. They denied the necessity of hypothecation of the vessel, and averred that the first assignees of the bond were the agents of the owners, and that the advance made by them was designed to prevent the libellant from proceeding against the vessel. A final joint reply was made by all the libellants. It appeared from the evidence that, when the bond was given, the master, by whom it was executed, owned one fourth of the vessel, subject to a mortgage to one Jesse Braddick, to secure a promissory note for $1,080, and the other three fourths were owned by parties residing at Tremont, Maine. The mortgage bore date November, 1857.

The vessel was disabled between New York and Darien, and, as alleged, put into Savannah for repairs. Twenty-two hundred and fifty dollars were expended in the repairs, and it did not appear that a less sum would have answered the purpose. The master first notified the owners, and requested assistance, and he wrote to Howland, Hinckley, & Co., and to C. & J. Peters, in New York to ascertain if they would furnish the funds for the repairs. From the owners, he received answer that they could do nothing to aid him, and, from the parties in New York, a draft for four hundred dollars, but this he could not negotiate. Having no means of his own, he then advertised for a loan on bottomry, but, finding no bidders, he engaged to give

the bond to the libellant. The vessel went first to Darien, thence to Point Peter, Gaudaloupe, thence to Trinidad, thence to St. Mary's in the state of Georgia. From St. Mary's she went to Havana, thence to Sagua La Grande, thence to New York, thence to Boston. It was clearly proved, that the owners were indebted to Howland, Hinckley, & Co. for materials furnished to complete or equip the vessel. It also appeared that C. & J. Peters had acted as brokers in negotiating the charter for the voyage. On the return of the vessel to St Mary's, they received information that she was about to be sold at auction to satisfy the bond, and communicated the same to the first-named parties, suggesting that, unless they took measures to have the bond transferred from the libellant, they would lose their claim. Howland, Hinckley, & Co. replied that they would advance half the necessary sum, if their then correspondents would advance the other half. The transfer was made to the Messrs. Peters, April, 1858, but equally for the benefit of the other parties. In September following, Howland, Hinckley, & Co. paid the other half, and took an assignment of the bond from the first assignees, and this suit was prosecuted in the name of the libellant for their benefit. In the district court, a decree was entered dismissing the libel.

Scudder & Randall, for libellant and appellant.

S. C. May, for respondents.

CLIFFORD, Circuit Justice. Several objections were made by the respondents to the right of the libellant to maintain this suit. In the first place, it is insisted that the suit is brought in the name of the wrong party, and that it cannot be maintained in the name of the libellant. That objection rests upon the proof that the libellant has parted with his interest in the bond, and upon the admitted fact that the suit is prosecuted in his name, for the benefit of the assignees and present holders of the same. If it was an action at law in the common-law courts, it would be well brought, and indeed could be maintained in no other way. All the authorities cited by the respondent admit that the assignee of a maritime contract may, in certain cases. enforce his rights in the admiralty by a suit in the name of the party to whom the promise was made, and from whom he derived his rights. For example, it is said, in Fretz v. Bull, 12 How. [53 U. S.] 468, that the party entitled to relief should always be made libellant, and that the practice of instituting the suit in the name of one person for the benefit of another only obtains in the admiralty in particular cases. But the same court admits that all persons entitled on the same state of facts to participate in the relief may join as libellants, whether the suit be in personam or in rem. Benedict, Adm. 386. Doubts have often been expressed whether a suit can be maintained against a carrier by a consignee who has no beneficial interest in the goods. Whether so or not, it is well settled that the presumption is that he has an interest, and to defeat the right to sue in his own name the prima facie presumption must be rebutted by proof. Lawrence v. Minturn, 17 How. [58 U. S.] 100. Mr. Parsons says a bottomry bond is generally regarded in the admiralty as a negotiable instrument, or interest, which, being transferred in good faith, and for a valuable consideration, may be put in force by the holder in his own name. In the case of The Rebecca, 5 C. Rob. Adm. 103, the warrant was taken out by the merchant, who having subsequently become an alien enemy during the progress of the suit, its prosecution was suspended, but not until the respondent had pleaded that fact in answer to the suit. An attempt was afterwards made by the attorney to revive the prosecution for his own benefit, alleging that the bond had been transferred to him, and that the obligee had become bankrupt. While the learned judge, who gave the opinion, admitted that a bottomry bond was a negotiable instrument, he nevertheless, in the argument of the opinion, put a case by way of analogy, which goes very far to show that the proceedings may be carried on in the name of the original party. A contract of hypothecation made by the master, says Mr. Abbott, does not transfer the property of the ship, but only gives the creditor a privilege, or claim upon it, to be carried into effect by legal process. Such a contract, says the same learned commentator, is one of those matters technically called choses in action, and therefore the duty created by it is not assignable at common law, so as to enable an assignee to sue upon it in his own name, or to make it subject to a set-off, although it may be available in a court of equity. In the admiralty, he says, a bottomry bond is a negotiable interest, which may be transferred, and put in issue by the person so acquiring it. Abbott, Shipp. p. 154. No doubt is entertained that a bottomry bond, in a qualified sense, is a negotiable interest, and that it is competent for the assignee to enforce payment in the admiralty in his own name. But it is not a negotiable instrument, in the broad sense in which that term is employed, as applied to bills of exchange and promissory notes. Thompson v. Dominy, 14 Mees. & W. 406. None of the cases decide that the assignee may not maintain the suit in the name of the original obligee of the bond, and it is difficult to see any reason connected with the obligor for the opposite rule. His rights are not thereby impaired, and it is not perceived that any undue advantage is secured to the assignee. Be that as it may, still in this case the real parties in interest appeared in the progress of the suit, and filed a supplemental libel, setting forth all the grounds of their claim. Answer

was made by the respondents to the supplemental libel, and the parties proceeded to issue and trial. All the parties are before the court, and full justice may be done in the premises. Under these circumstances, and in view of the state of the pleadings, I am of the opinion that this objection cannot be sustained.

It is objected by the respondent, in the second place, that the bond is invalid, because there was no such necessity in the case as authorized the master to make it.

Maritime hypothecations had their origin in the necessities of commerce, and are said to be the creatures of necessity and distress. They are of a high and privileged character, and are held in great sanctity by maritime courts. 1 Conk. Adm. (2d Ed.) 266. Such contracts, said Lord Stowell, in the case of The Kennersley Castle, 3 Hagg. Adm. 7, were intended for the purpose of procuring the necessary supplies for ships which may happen to be in distress in foreign ports, where the master and the owners are without credit, and where, unless assistance could be procured by means of such instruments, the vessels and cargo must perish. But the master is not the owner of the property, so as to have a right to bind it at his own will and pleasure. Hypothecation of the vessel by the master is only authorized when based upon necessity, and the required necessity is twofold in its character. It must be a necessity of obtaining repairs or supplies, in order to prosecute the voyage, and also of resorting to such a loan, from inability to procure the required funds in any other way. If the master has funds of his own or of the owner in his possession, or within his control, or if he can, by any other reasonable means, procure them upon his own credit or that of the owners, or by advances on the freight, or by passage money he is not at liberty to resort to a bottomry bond. The Hersey, Id. 407; The Fortitude [Case No. 4,953]; The Active [Id. 12,070]; 1 Conk. Adm. 269; The Aurora, 1 Wheat. [14 U. S.] 102; Thomas v. Osborn, 19 How. [60 U. S.] 31. Such hypothecation can only be made by the master in a foreign port, but the term "foreign port," in the jurisprudence of the United States, includes all maritime ports other than those of the state where the vessel belongs. Applying these principles to the present case, it is obvious that the objection under consideration is wholly without merit. Disabled as the vessel was, and unable to leave the port in her crippled condition, the necessity for repairs was pressing and urgent. Her master had no means of his own or of the owners, within his control, and he and they were alike without credit in the port of distress. Notice to the owners brought neither assistance nor the promise of assistance, and neither the creditors of the vessel, nor the brokers who negotiated the charter, were able or willing to furnish any available funds. All other resources failing, the master, as was

his duty in the emergency, promised to hypothecate the vessel; and having obtained the loan upon the faith of that promise, and made the repairs, he executed the bond to secure its payment. Courts of justice everywhere agree that where the supplies are ordered by the master, and the repairs made, and the bond given afterwards, the bond is good, provided it was originally intended to furnish the supplies on the credit of the ship, and to secure the payment of the amount advanced in that way. The Virgin, 8 Pet. [33 U. S.] 552; La Ysabel, 1 Dod. 276; Furniss v. The Magoun [Case No. 5,163]. Tested by the strictest rules, therefore, I am of the opinion that there was a legal necessity for the loan in this case, and that the acts of the master in executing the bond were fully authorized. Unless it be so held in this case, it would be difficult to imagine on what state of facts it would be lawful for the master to hypothecate the ship, or for the foreign merchant to part with his money.

3. It is insisted that the lien upon the vessel, if any ever existed under the bond, was waived when she was allowed, after the money was due, to depart from St. Mary's, and because she sailed for Boston, after her return to New York. She did not return to Savannah, and the libel was filed shortly after her arrival at Boston. Negotiations, in the mean time, were pending between the owners and the creditors of the vessel, and the affairs of both were apparently in great confusion. Claims of this description are wisely favored by courts of justice, as an inducement to the foreign merchant to relieve the necessities of the vessel in ports of distress. Such liens go with the ship, and are often held valid after very considerable delay, yet, when the merchant, or obligee, can reasonably pursue his remedy, it is his duty so to do. If the lender omits to enforce payment for an unreasonable time, and without reasonable cause, and a third person, by purchase or levy, without knowledge of the lien, acquires the vessel, the lender will be held to have waived and lost his lien by the delay. But purchasers, who acquire the vessel, with knowledge of the existence of the lien, and that it is yet to be enforced, stand upon a different footing, and are entitled to much less favor. 1 Pars. Mar. Law, 433; Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 328. One of the principal reasons for requiring expedition in the enforcement of the lien is to guard the interests of innocent purchasers who have no knowledge of its existence. Stale claims of this sort will not be enforced in the admiralty, but where there was a clear necessity for the loan, and the proceedings were instituted within a reasonable time, the maritime law will not suffer the lien to be affected merely by the departure of the vessel from the return port, with or without the knowledge of the holder of the bond. The Nestor [Case No. 10,126]. In this case the vessel never returned to

Savannah; and it does not appear that there was any unreasonable delay in instituting the suit after her arrival at the port of return. Unreasonable delay, therefore, is not shown in this case, and it is clearly proved that the claimants, when they took their bill of sale of the master, for one quarter of the vessel, had full knowledge of the lien, and knew full well that it was yet to be enforced. Admissions to that effect were several times made by the claimant, who negotiated the bill of sale, and he several times made declarations signifying his intention to pay the bond.

4. In the last place, it is insisted by the respondents that the bond was paid, and cancelled, before the suit was instituted by the parties for whose benefit it is prosecuted. Negotiations to that effect undoubtedly were commenced, and carried on, for some time, between those parties and the agent of the owners. Those negotiations were based upon the assumption and expectation that the whole vessel was to be conveyed by the owners. One fourth of the vessel, however, belonged to the master, who was absent, in charge of the vessel. His concurrence was necessary to the consummation of the arrangement, but, inasmuch as his signature to the bill of sale could not be procured until his return, the completion of the arrangement was postponed, and was finally abandoned, by the consent of all the owners who had signed the instrument. Beyond question, it was, at one time, agreed between those parties and the agent of the owners, that the former should take a conveyance of the whole vessel, and as a part of the consideration should pay the bottomry bond. But the whole evidence shows that the proposition was never carried into effect, and the agent of the owners, to whom it was made expressly, testifies that it was subsequently withdrawn by the owners, and entirely abandoned. Five eighths of the vessel were owned by parties residing in the state of Maine. On the 30th of May, 1858, those parties conveyed their interest to Howland, Hinckley, & Co., by a bill of sale. At the same time, the parties last named gave back a bond conditioned that, if they should sell the interest so conveyed, they would account to the obligees for any surplus arising from such sale over and above the sum of forty-five hundred dollars and incidental expenses, and covenanting to reconvey in the case the vessel was not lost or sold upon being paid that sum and interest, either out of the net earnings of the vessel or otherwise. Some of the mortgagors deny all knowledge of the bond of defeasance; but the proof shows that it was duly delivered to one of their number, and no doubt is entertained that it speaks the true character of the transaction. That mortgage was given to secure the sum of thirty-seven hundred dollars, due to the mortgagees, for advances made to complete or equip the vessel, and for the benefit of certain other creditors of the owners. Nothing was said at the time of the negotiation, or when the mortgage was executed, about paying or cancelling the bottomry bond, and not a dollar was included in the mortgage for that purpose. For these reasons, I am of the opinion that the libellant is entitled to a decree in his favor, and that the one fourth of the vessel, owned by the respondents, is justly chargeable with the payment of the bond, in proportion to the interest which they represent.

The decree of the district court is, therefore, reversed, with costs. Decree for libellant.

[NOTE. For decision of an appeal from the taxation of costs, see Case No. 2,162.

[A port of one of the states other than a state to which a vessel belongs is a "foreign port," within the rules allowing the creation of liens against vessels for necessary supplies. The Leslie, Case No. 8,604. See The James Guy, 9 Wall. (76 U. S.) 758; Id., Cases Nos. 7,195 and 7,196; Hardy v. The Ruggles, Case No. 6,062; Ex parte Easton, 95 U. S. 68; The Sarah J. Weed, Case No. 12,350; The Chusan, Id. 2,716; The Canada, 7 Fed. 119; Whitlock v. The Thales, Case No. 17,578; Hull of a New Brig, Id. 6,858; The William and Emmeline, Id. 17,687; The St. Lawrence, Id. 12,234; The Stephen Allen, Id. 13,361; Thomas v. The Kosciusko, Id. 13,901; The Hilarity, Id. 6,480. Compare Levering v. Bank of Columbia, Cases Nos. 8,286 and 8,287.]