## Insurance Company *v.* Gossler.

1. So long as a vessel exists *in specie* in the hands of the owner, although she may require repairs greater than her value, a case of "utter loss," within the meaning of a bottomry and respondentia bond, does not arise, and she continues subject to the hypothecation.

2. The holder of such a bond, which was conditioned to be void should an utter loss from any of the enumerated perils occur, is, upon a wreck of the vessel during the specified voyage, not amounting to such loss, entitled to the proceeds of the cargo saved by his efforts, as against the insurers thereof, who accepted an abandonment by the owners as for a "total loss," and paid the amount of their policies, said proceeds being insufficient to satisfy the bond. *So held* in this case, which relates solely to such proceeds.

Error to the Circuit Court of the United States for the District of Massachusetts.

The plaintiff, the Delaware Mutual Safety Insurance Company, was insurer of a cargo of sugar on board the "Frances," from Java to Boston. After leaving her port of departure, the vessel encountered a hurricane, which compelled her to proceed to Singapore, where she was repaired and fitted to continue the voyage.

To meet the expenses of repairs, the master was obliged to borrow at Singapore the sum of $26,055.43, Singapore currency, and to execute, on the twelfth day of July, 1872, a bottomry bond for that sum, with marine interest at twenty-seven and a half per cent, upon the vessel and freight.

The bond contained the following stipulation: —

"*Provided, nevertheless*, and it is hereby agreed, that if, in the course of the said voyage, an utter loss of the said vessel by fire,

lightning, enemies, men-of-war, or any other perils, dangers, accidents, or casualties of the seas or navigation, shall unavoidably happen, then the said loan and interest shall not be payable, and all parties liable therefor shall be wholly discharged therefrom, and the loss shall be wholly borne by the said lenders or bondholders, and every thing herein contained for payment thereof shall be void and determined; save and except only, and provided in such case, that the said lenders or bondholders shall be entitled to such average as can be hereby lawfully secured to them on all salvage recoverable in respect to the said vessel, freight, and goods, or any of them."

The vessel sailed from Singapore for Boston, encountered a storm in the month of December following, and was cast ashore on Cape Cod, Mass.

The defendants, Gossler & Co., who were agents of the bondholders and assignees of the bond, succeeded in saving somewhat less than half the sugar on board, and forwarded it to Boston.

The vessel, as she lay upon the beach, was surveyed; and, having been found incapable of repair, was broken up, and her materials were sold. When she was sold, she lay "on the beach, full of water, as high as she could, but so low as to be submerged at high-water." The chains and anchors, sails and rigging and hull, were sold separately, at auction, by the underwriter, in January, 1873: the chains, anchors, and other utensils bringing $1,494.75; the sails and rigging, $2,323.70; and the hull, $2,000.

Upon learning of the disaster, the owners of the cargo made abandonments in writing to the plaintiff as the underwriter thereon, and claimed payment for a total loss under their respective policies.

The letters of abandonment were dated, respectively, Dec. 28, 30, and 31, 1872.

In March, 1873, the plaintiff paid to each owner the amount of a total loss under his policy; and received on the same date, from them so insured and paid, an assignment and transfer in writing of "the sugar of said owners, and all their right, title, interest, trusts, claim, and demand therein and thereto."

The defendants, as agents of the bondholders, with the consent of the owners of the cargo, proceeded to sell the sugar saved; and now hold the proceeds, claiming them on account of said bond, such proceeds not being sufficient to satisfy it. The plaintiff having, at all times, claimed them, as the underwriter who accepted abandonments and paid a total loss thereon, brought this action to recover them.

The case was tried by the court below; and, judgment having been rendered for the defendants, the company brought the case here.

*Mr. William G. Russell* and *Mr. Charles M. Reed* for the plaintiff in error.

The facts show an "utter loss" of the vessel. *Thompson* v. *The Royal Exchange Assurance Co.,* 1 M. & S. 30; *The Elephanta,* 9 Eng. L. & Eq. 553; *Joyce* v. *Williamson,* 3 Doug. 164; *Pope et al.* v. *Nickerson et al.,* 3 Story, 465; *Murray* v. *Hatch,* 6 Mass. 464; *Cambridge* v. *Anderton,* 2 Barn. & Cress. 691; *Roux* v. *Salvador,* 3 Bing. N. C. 266; 2 Arnould, Ins., sect. 364, 365; Marshall, Ins. 446; 2 Parsons, Mar. Ins. 73; 2 Phillips, Ins., sect. 1485; *Barker* v. *Janson,* Law Rep. 3 C. P. 303; *Walker* v. *Protection Insurance Co.,* 29 Me. 317; *Gardner* v. *Salvador,* 1 Moo. & R. 116; *Irving* v. *Manning,* 1 H. L. Rep. Cas. 287; *Mullett* v. *Shedden,* 13 East, 303; *Cambridge* v. *Anderson,* Ry. & M. 60; *Poole* v. *The Protection Insurance Co.,* 14 Conn. 46; *Tudor* v. *New England Mutual Marine Insurance Co.,* 12 Cush. (Mass.) 554; *Hugg* v. *Augusta Insurance & Banking Co.,* 7 How. 595; *Dyson* v. *Rowcroft,* 3 Bos. & Pul. 474; *Appleton* v. *Crowninshield,* 3 Mass. 443; *Peele* v. *Suffolk Insurance Co.,* 7 Pick. (Mass.) 254; *Peele et al.* v. *Merchants' Insurance Co.,* 3 Mason, 27; *Crosby* v. *New York Mutual Insurance Co.,* 5 Bosw. (N. Y.) 369; *Stagg* v. *United Insurance Co.,* 3 Johns. (N. Y.) Cas. 34; *Coit* v. *Smith,* id. 16.

The utter loss of the vessel having avoided the bond, the holders of it had no right, under its terms, to the proceeds of the cargo saved from the wreck. 1 Parsons, Mar. Ins. 221; 2 Park, Ins. 628, 629; 2 Phillips, Ins., sect. 1488; *Joyce* v. *Williamson,* 3 Doug. 164; *Robertson & Brown* v. *United Insurance Co.,* 2 Johns. (N. Y.) Cas. 250; *Appleton* v. *Crowninshield,* 8 Mass. 340; *Thorndike* v. *Stone,* 11 Pick. (Mass.) 183; *Bray*

v. *Bates and Another*, 9 Metc. (Mass.) 237 ; *The Insurance Company of Pennsylvania* v. *Duval and Another*, 8 Serg. & R. (Pa.) 138 ; *The Virgin*, 8 Pet. 538 ; *The Hunter*, 1 Ware, 251 ;

Parsons, Mar. Law, 420, and cases cited ; Marshall, Ins., c. 13, sect. 7 ; *Stephen* v. *Broomfield*, L. R. 2 P. C. 516 ; *Columbian Insurance Co.* v. *Ashby*, 13 Pet. 331 ; *Gray* v. *Waln*, 2 Serg. & R. (Pa.) 229.

*Mr. Charles A. Welch, contra*, cited *The Virgin*, 8 Pet. 538 ; 3 Kent, Com. 59, 360 ; 2 Arnould, Ins., sect. 392 ; 1 Phillips, Ins., sect. 1170 ; Abbott, Shipp., p. 126 ; Maude & Pollock, Shipp., p. 440 ; Maclachlan, Shipp., p. 57 ; Hopkins' Hand-Book of Average, p. 93 ; Crump, Mar. Ins., sect. 147 ; *Thompson* v. *The Royal Exchange Assurance Co.*, 1 M. & S. 30 ; *The Great Pacific*, Law Rep. 2 Ad. & Ec. 381 ; s. c. Law Rep. 2 P. C. 516 ; *Broomfield* v. *Southern Insurance Co.*, Law Rep. 5 Ex. 192 ; *The Insurance Company of Pennsylvania* v. *Duval and Another*, 8 Serg. & R. (Pa.) 138 ; *Delaware Insurance Co.* v. *Archer*, 3 Rawle (Pa.), 216 ; *The Catherine*, 1 Eng. L. & Eq. 679 ; *The Elephanta*, 9 id. 553 ; Bynkershoek, Quæst. Pub., lib. 3, ch. 16 ; *The Dante*, 2 W. Rob. 427 ; *Stephen* v. *Broomfield*, Law Rep. 2 P. C. 516.

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Maritime hypothecations had their origin in the necessities of commerce, and they are said to be the creatures of necessity and distress. When properly authorized and duly executed, they are of a high and privileged character, and are held in great sanctity by maritime courts. *The Vibilia*, 1 W. Rob. 1 ; *The Rhadamanthe*, 1 Dod. 201 ; *The Hero*, 2 id. 139 ; *The Kennersley Castle*, 3 Hagg. 1.

Instruments of hypothecation are usually executed by the master, he being regarded as the agent of the owner ; the rule being that the owner is bound to the performance of all lawful contracts made by the master relative to the usual employment of the ship, and to the repairs and other necessaries furnished for her use. *The Aurora*, 1 Wheat. 96.

Contracts of the kind are authorized in emergencies, for the purpose of procuring necessary repairs and supplies for ships which may happen to be in distress in foreign ports, where the

master and the owners are without credit, and where, unless assistance can be procured by means of such an hypothecation, the voyage must be broken up, or the vessel and cargo must perish. *Burker* v. *The Brig M. P. Rich*, 1 Cliff. 308.

Such an hypothecation of the vessel by the master is only authorized when based upon necessity. And the required necessity is twofold in its character: it must be a necessity of obtaining repairs or supplies in order to prosecute the voyage, and also of resorting to such an hypothecation from inability to procure the required funds in any other way. *Thomas et al.* v. *Osborn*, 19 How. 22 ; *The Hersey*, 3 Hagg. 404.

Sufficient appears to show that the plaintiffs were the underwriters on the cargo of the bark " Frances," consisting of sugar, on her voyage from Java to Boston ; that, in due course of navigation, the bark sailed from a port of Java, duly laden, for her return port ; that she soon encountered a hurricane, which compelled the master to cut away her masts to save the vessel, and to put into a neighboring port for repairs, from whence it became necessary for the bark to proceed to the port of Singapore to fit the vessel to continue the voyage. Destitute of funds to pay the expenses incurred for the repairs, and without credit, the master was obliged to execute a bottomry bond there for the sum necessary to liquidate those expenses, with marine interest at twenty-seven and one-half per cent, upon the bark, cargo, and freight. All matters of the sort having been adjusted, the bark sailed from the port of Singapore for the port of Boston ; but, before she reached her port of destination, she encountered a storm, and in the month of December of that year was wrecked and driven ashore on Cape Cod. Prompt measures for saving as much as possible from the wreck were adopted by the defendants, who were the agents of the bondholders or the assignees of the same ; and it appears that they succeeded in saving nearly half of the cargo, which was sent forward to Boston, and was subsequently sold with the consent of the owners,

Subsequent to the shipwreck, the bark was surveyed as she lay upon the beach ; and, being found to be incapable of being repaired, she was broken up, and her material was sold in separate parcels, including the hull, chains, anchors, sails, and rig-

ging; and, when the owners of the cargo were informed of the disaster, they made abandonment in writing to the underwriters, under each policy of the respective dates, as stated in the agreed statement, claiming payment on each policy as for a total loss. Pursuant to that claim, the plaintiffs, as such underwriters, paid to the insured owners of the cargo the amount as for a total loss under each policy, and received from the owners an assignment and transfer in writing of the sugar of the owners, and of all their right, title, and interest in the same.

Two other matters are admitted : 1. That the defendants hold the proceeds of the sugar, the amount being less than the amount of the bond. 2. That the plaintiffs accepted the abandonments tendered by the owners of the cargo, and have at all times claimed what was saved of the cargo.

Payment being refused, the plaintiffs brought an action of assumpsit against the defendants for money had and received, and the parties submitted the case to the Circuit Court, upon an agreed statement of facts. Hearing was had, and the Circuit Court rendered judgment for the defendants, and the plaintiffs sued out the present writ of error.

Due execution of the bond in question is conceded; nor is it questioned that the circumstances were such at the time as to give the master the power to make the loan, nor that the bond by its terms covers the cargo and pending freight as well as the bark, unless an utter loss of the vessel occurred during the voyage.

Authority of the master to hypothecate the ship and pending freight in such a case, whenever, within the meaning of the maritime law, it becomes necessary to enable him to complete the enterprise in which the ship is engaged, was never doubted, whether the occasion arises from extraordinary peril or misfortune, or from the ordinary course of the adventure. Nothing but necessity can be a proper foundation for such an hypothecation. And that necessity, as before stated, must be twofold in its character : first, it must be a necessity of obtaining repairs or supplies in order to prosecute the voyage; secondly, it must be a necessity of resorting to a bottomry bond, from inability to procure the required funds in any other way. *The Hersey,*

3 Hagg. 404 ; *The Fortitude,* 3 Sumn. 234; 1 Conkl. Adm. (2d ed.) 269; Abbott, Shipp. (11th ed.) 126.

Ship-owners appoint the master, and they are in general responsible for his acts; but the general rule is different as to the cargo, in respect to which the master is the mere depositary and common carrier, whose whole relation to the goods consists in his obligation of due conveyance, safe custody, and right delivery.

Viewed in that light, it was supposed at one time that the master had no power to hypothecate the cargo to raise funds to prosecute the voyage, whatever the necessity might be ; but the rule is now well settled the other way, that the hypothecation may extend to the cargo as well as to the ship and freight; *The Lord Cochrane,* 1 W. Rob; 313 ; *The Gratitudine,* 3 C. Rob. 240 ; *The Packet,* 3 Mason, 257 ; *The Zephyr,* id. 343 ; *The United Insurance. Co.* v. *Scott,* 1 Johns. (N. Y.) 105; *Fontaine* v. *The Colombian Insurance Co.,* 9 id. 29 ; *Searle* v. *Scovell,* 4 Johns. (N. Y.) Ch. 218 ; *The American Insurance Co.* v. *Coster,* 3 Paige (N. Y.), 323.

Bottomry bonds, when given *bona fide* and for legitimate purposes, are to be liberally protected. It is important for the interests of commerce that a master in a foreign port, standing in need of assistance, arising out of some unforeseen necessity, to complete a voyage, and having no credit, should for that object be invested with authority to pledge the ship, and charge upon it the repayment of the loan in case of her safe arrival. *The Reliance,* 3 Hagg. 66.

Beyond all doubt, the bond in this case hypothecates the cargo as well as the vessel and the unpaid freight by way of bottomry, as security for the payment of the loan on the terms and conditions specified in the instrument, which are as follows : 1. That the vessel shall proceed, and complete her voyage without unnecessary deviation. 2. That the principal and marine interest shall be paid in the manner specified, within three days after the safe arrival of the vessel at the port of destination, and before the cargo is landed or the freight collected. 3. That the cargo shall not be landed nor the freight collected until the payment is made, and that the bondholders for the time being shall have the privilege of enforcing those

conditions. 4. That interest on the aggregate amount at the current rate in the port of destination shall be paid in case of failure to discharge the amount of the principal and marine interest as stipulated.

Superadded to those terms and conditions is the following stipulation, in the form of a proviso : that if in the course of the voyage an utter loss of the vessel by fire, lightning, enemies, men-of-war, or any other perils, dangers, accidents, or casualties of the seas or navigation, shall unavoidably happen, then the loan and interest shall not be payable; and all parties liable therefor shall be wholly discharged therefrom, and the loss shall be wholly borne by the lenders or bondholders, and every thing herein contained for payment shall be void and determined, save and except only, and provided in such case, that the lender or bondholders shall be entitled to such average as can be hereby lawfully secured to them on all salvage recoverable in respect to the vessel, freight, and goods, or any of them.

Difference of opinion exists among Continental writers as to the meaning of the exception at the close of the preceding condition; but the great weight of authority, even from that source, is, that the holder of the bottomry bond is preferred over the insurer or owner, to the extent of his legal claim for principal and marine interest secured by the bond. 3 Boulay Paty, Cours de Droit Commercial Maritime, 183.

Instead of that, Valin holds that the lender on bottomry is entitled in such a case only to such a proportion of the value of the property salved as the sum loaned bears to the whole value of the property hypothecated. Pothier and Émérigon concur with the writer first named; and the Court of Privy Council Appeals decided, that, if the vessel is lost, the lender on bottomry, though his remedy is limited to the value of the property salved, is entitled to the whole of what is saved, provided it was included in his security. *Stephens* v. *Broomfield,* Law Rep. 2 P. C. 522; 2 Émérigon, Traité des Assurances Maritimes et des Contrats à la grosse, 544.

Much discussion took place in the preceding case, as to the meaning of the stipulation in the closing part of the condition of the instrument, which was quite similar in legal effect to the

closing exception in the present case; the contention being there, as here, that it gave the owners of the ship or cargo, as the case may be, the right to share in the salved property: but the court, without hesitation, rejected the proposition; holding that the theory involved a forced construction of the stipulation, utterly inconsistent with such a maritime contract, and that it reserved no such right to the owners. *The Great Pacific*, L. R. 2 Ad. & Ec. 381.

Authorities to show that the doctrine of constructive total loss is in no respect applicable to such a contract are numerous, unanimous, and decisive. *Thomson* v. *The Royal Exchange Assurance Co.*, 1 M. & S. 30.

In the case of bottomry, said the Chief Justice in that case, nothing short of a total destruction of the ship will constitute an utter loss; for, if it exist *in specie* in the hands of the owner, it will prevent an utter loss: and text-writers of the highest repute adopt the same rule, and express it in substantially the same language. Nothing but an utter annihilation of the subject hypothecated, says Chancellor Kent, will discharge the borrower on bottomry; the rule being that the property saved, whatever it may be in amount, continues subject to the hypothecation. 3 Kent, Com. (12th ed.) 359; Williams & Bruce, Prac. 47.

Unless the ship be actually destroyed, and the loss to the owners absolute, it is not an utter loss within the meaning of such a contract. If the ship still exists, although in such a state of damage as to be constructively totally lost, within the meaning of a policy of insurance; or if she is captured, and afterwards retaken and restored, she is not utterly lost, within the meaning of that phrase in the contract of hypothecation. Maude & Pollock, Shipp. (3d ed.) 44; *The Catherine*, 1 Eng. L. & Eq. 679; *The Elephanta*, 9 id. 553.

Support to that view, of a decisive character, is derived from the case of *Pope* v. *Nickerson* (3 Story, 489), decided by Judge Story, where he says, that, in cases of bottomry, nothing but an actual total loss of the ship in the voyage will excuse the borrower from payment, not even when by reason of the enumerated perils the ship shall require repairs greater than her value; and he adds, that the proposition is fully borne out by

authority; and he adopts and fully approves what was decided in the case of *Thomson* v. *The Royal Exchange Assurance Company*, to which reference has already been made, that the question in such a case is not, whether the circumstances were such as that, in case of insurance, the insured might have abandoned the ship, but whether it was an utter loss within the true intent and meaning of a bottomry contract; and he held that, in cases of bottomry, a loss not strictly total cannot be turned into a technical total loss by abandonment, so as to excuse the borrower from payment, even when the expense of repairing the ship exceeds her value.

Hypothecations of the kind are created by contract in writing, whereby the master of a vessel in a foreign port, not having any credit in the port where the vessel is lying, is enabled to obtain money for the repair and equipment of the vessel, and for necessary supplies for the prosecution of the voyage, by creating a charge or lien upon the vessel and freight, or upon the vessel, freight, and cargo, in favor of the lender; so that, if the vessel or cargo is sold or mortgaged by the owners, the property will be burdened with the charge or lien in the hands of the purchaser or mortgagee. Addison, Contr. (6th ed.) 275.

Contracts regularly created in that mode, and for that purpose, give rise to a maritime lien well understood in the civil law as existing, even without actual or constructive possession; the rule being, that wher er a maritime lien of the kind exists, it gives a *jus ad rem* to the property to which it attaches, to be carried into effect by appropriate legal process. Such a contract does not transfer the property hypothecated; but only gives the creditor a privilege or claim upon it, to be carried into effect by legal process, in case the vessel arrives at the port of destination in safety. Abbott, Shipp. (11th ed.) 128; *The Tobago*, 5 C. Rob. 218; *Stainbank* v. *Fenning*, 11 C. B. 88; *Stainbank* v. *Shepard*, 13 id. 417.

Where several securities of the kind are given upon the same ship and cargo, the rule is, all other things being equal, that they take effect in the inverse order of their dates; because it is supposed that the last loan furnished the means of preserving the ship, and that without it the prior lenders would have entirely lost their security. *The Eliza*, 3 Hagg. 86.

Subject to the rule that requires diligence in putting the bond in suit, securities of this nature, when the fund is deficient, take priority, as before remarked, in the inverse order of their dates; the ground for the preference of the later bonds to the earlier being the condition of necessity on which the validity of each is originally dependent. which is applicable to the last as well as to the first, and is regarded as a safe reason for presuming that the one latest in date furnished the means for preserving the property for the earlier lender. Maclachlan, Shipp. (2d ed.) 5.

Liens of the kind are preferred to all other claims upon the property, except those arising from seamen's wages, the claims of salvors for subsequent service in saving the adventure, and the holder of a subsequent bottomry bond. *The William F. Safford*, Lush. 69; *The Priscilla*, id. 1.

Throughout, it should be borne in mind that the bond in this case covers the bark, pending freight and cargo, and that the controversy in the case has respect only to the proceeds derived from the sale of so much of the cargo as was saved by the efforts of the defendants. Where the bond only covers the ship, the lenders run no risk as to the cargo, as they must be paid if the ship arrives in safety, even though the whole cargo is lost.; but, where the bond covers the cargo as well as the vessel, the lender, unless the condition is otherwise, is entitled to be paid even if the ship is lost, if enough of the cargo arrives in safety to pay the bottomry loan, the rule being that the maritime lien of the lender attaches to the entire property covered by the bond, or, to all that part of it which arrives at the port of destination in safety.

Actual total loss of the property by the described perils displaces the lien of the lender, and defeats his right of recovery; but the rule is, that, if the ship is once bottomried, the bond attaches to the very last plank, and the holder of the bond may have that sold for his benefit. *The Catherine*, 1 Eng. L. & Eq. 679.

Abundant authority exists for that proposition, and the court is of the opinion that the same rule is applicable to the cargo in cases where it is without condition covered by the bond. *The Virgin*, 8 Pet. 538.

Prior remarks are sufficient to show that the doctrine of constructive total loss is not applicable to contracts of bottomry, which serves very strongly to show that the maritime lien of the bondholder attaches to every part of the property covered by the bond, as seems to follow from all the authorities upon the subject. *Broomfield* v. *Southern Insurance Co.*, L. R. 5 Ex. 192.

Slight differences exist between a loan on the ship and a *respondentia* loan or loan on the cargo ; but it is unnecessary to remark upon that distinction, as the bond in this case covers the bark as well as the cargo. 2 Marsh. 734 ; *Stephens* v. *Broomfield*, 6 Moore, P. C. N. s. 161.

By the general marine law, the lender on bottomry is entitled to be paid out of the effects saved, so far as those effects go, if the voyage be disastrous. *Appleton* v. *Crowninshield*, 3 Mass 443.

Underwriters and lenders on bottomry stand upon a different footing, as was well explained at a very early period in our judicial history. *Wilmer* v. *Smilax*, 2 Pet. Adm. 299.

By an abandonment, the insurer is placed in the situation of the insured whom he represents, and can have no greater right than the insured would have had. Unlike that, the lender on bottomry loses his remedy only when the ship or other property hypothecated is wholly lost; and, where parts are preserved, such parts are esteemed his proper goods, being presumed to be the product of his money ; and he, therefore, takes preference of the owner or insurer. In case of shipwreck, " the owners are not personally bound, except to the extent of the fund salved which has come into their hands." *The Virgin*, 8 Pet. 538.

"Utterly lost," said Chief Justice Tilghman, is a strong expression ; intended, as he held, to distinguish the case from one where the vessel is technically lost, as in case of abandonment. Such must have been his meaning; for he adds, that a ship is not utterly lost while she remains *in specie* in the hands of the owners. " Had she been taken by an enemy, she would have been utterly lost to the owner," unless she had been recaptured and restored. " So, had she been burnt, or wrecked and gone to pieces," unless some of her sails, masts, anchors, or chains had been saved. But she is not utterly lost merely because it

may cost more than she is worth to repair her. *Insurance Company of Pennsylvania* v. *Duval et al.*, 8 S. & R. (Pa.) 138.

Salved property, in case of wreck or other disaster, says Phillips, continues to be subject to the hypothecation; but, if the loss is by the perils assumed by the lender, the borrower becomes discharged from all liability on his bond, excepting to the amount saved. Nothing short of a total loss will discharge the borrower. 2 Phillips, Ins. (5th ed.), sect. 1170.

High authority also exists for the proposition, that a total loss within the meaning of a bottomry bond cannot happen if the ship exists *in specie*, although she may be so much injured on the voyage as not to be worth repairing and bringing to the ultimate place of departure. Abbott, Shipp. (11th ed.) 126.

Bynkershoek defines such contracts to be a pledge of the vessel or other effects upon which the loan is made, and of what may remain of them after any event by which the personal responsibility is excused. Bynk., Quæst. Pub., lib. 3, c. 16.

From the moment of the accident, says Émérigon, the lender is seised of right to the effects saved, he having a special lien upon them for the payment of his debt, saving the freight and salvage; and the French ordinance is to the same effect, the rule there promulgated being that in case of shipwreck the security of the loan is reduced to the value of the effects saved from loss. Title 5, art. 17.

Decided support to the proposition that the lien extends to whatever is saved from the property covered by the bond is also derived from a case in which the opinion was given by Chief Justice Gibson, in which he expressly decided that the lender in a *respondentia* bond takes the risk only of a total loss, that any part of the property which arrives goes to the holder of the bond, without regard to whether it be great or whether it be small, so that it does not exceed the amount of the loan. *The Delaware Insurance Co.* v. *Archer*, 3 Rawle (Pa.), 226.

Rules of law defining the right of abandonment in cases of insurance do not apply in bottomry controversies, as there is no constructive total loss in the latter class of litigation. In-

stead of that, the rule is, that if the ship exists *in specie*, though in a state which would warrant an insured to make an abandonment, as where the cost of repairs would greatly exceed the value when repaired, the lender on bottomry may still recover; for the ship must be absolutely and wholly destroyed, in order to discharge the borrowers. 2 Arnould, Ins., by Maclachlan (4th ed.), 945.

Examined in the light of these authorities, it is clear that the bark in this case was not utterly lost within the meaning of the bottomry bond, when considered in view of the facts as they existed at the time the vessel was sold, and before she was voluntarily broken up by the purchaser. Subsequent acts of the purchasers cannot affect the right of the defendants; and, if not, then the proof is full to the point that the vessel existed *in specie* as she lay stranded on the beach. *The Brig Draco*, 2 Summ. 157.

Shipwreck occurred in this case before the bark arrived at her port of destination: but the agreed statement shows that the vessel, though "cast ashore," still existed *in specie*, and that the voyage was terminated by a sale of the bark at an intermediate place; that she was surveyed subsequent to the disaster, as she lay upon the beach, and, though found to be incapable of repair, she was not an utter loss within the maritime rule applicable in such a case; nor can the act of the owners in making an abandonment as for a constructive total loss have any effect to conclude or impair the rights of the defendants as the holders of the bottomry bond.

*Judgment affirmed.*