## MILLER *et al. v.* O'BRIEN.

### *District Court, S. D. New York.* June 6, 1888.)

SHIPPING—LIABILITY OF OWNER FOR CONTRACT OF MASTER—BOTTOMRY BONDS—TRANSHIPMENT—PAYMENT BY OWNER OF CARGO—ACT JUNE 26, 1884, § 18.

    The master of the American ship J. executed a bottomry bond on his vessel and cargo, part of which had been transhipped into the L., the bond covering "said vessel and her cargo, including that portion transhipped on the L., * * * upon condition that if the *said vessel* should within five days set sail, * * * and upon arrival the master should pay the advances, etc., or if *said vessel* should by perils of the sea * * * be an utter loss," the bond to be void. The L. arrived safely, but the J., with her cargo, was a total loss. *Held* that, neither under the general maritime law, nor Rev. St. U. S. § 4283, and the supplementary act of June 26, 1884, § 18, limiting a ship-owner's liability for the acts and contracts of the master to the value of the ship and freight, was the ship-owner liable to the owner of the cargo for the amount of the bottomry bond paid by him to redeem that portion of the goods arriving by the L. in safety from the lien of said bond, no personal fault or privity of the ship-owner to the loss being shown.

In Admiralty. On exceptions to libel.

    This was a libel against the respondent *in personam*, to recover money which the libelants paid in Germany to redeem their cargo from a bottomry bond executed by the master of the American ship Andrew Johnson, at Callao, Peru, on September 15, 1884. The libel avers that the libelants, in June and July, 1884, shipped on board said vessel at Iquique Bay and at Calena Buena about 20,000 bags of nitrate of soda, to be transported to Hamburg, Germany; that she sailed from the latter port

for Hamburg on July 15th, in an unseaworthy condition; that thereafter she began to leak badly, and in distress put into Callao, Peru, on August 4th; that she was obliged for safety to tranship 1,200 tons of her cargo on board the British bark Mary J. Leslie, to be carried to Hamburg; and that for repairs and transhipment she necessarily incurred an expense of £2,215 5s. 9d., British sterling, which the master was obliged to obtain on bottomry of the ship, freight, and cargo, including the 1,200 tons shipped on the Leslie; for which sum the master legally executed a bottomry bond to Messrs. Grace Brothers & Co., merchants of Lima, with maritime interest at the rate of 17½ per cent.; making in all £2,599 8s. 9d.; that the Leslie arrived at Hamburg safely, but that the ship Andrew Johnson became a total loss on the voyage from Callao; and that the libelants, in order to obtain possession of the 1,200 tons of cargo belonging to them, were obliged, on March 17, 1885, to pay the whole amount of said bottomry and *respondentia* bond; and that £1,617 4s. 3d. ($7,870.16) thereof were charges specifically made and incurred by and for the benefit of the said ship Andrew Johnson and her freight, and the owner thereof; and that demand of the last-named sum had been made upon the respondent, and payment refused. The respondent excepted to the libel, (1) in that it does not state the nature of the action; and (2) that it does not show a cause of action against the respondent.

*Butler, Stillman & Hubbard, (W. Mynderse,)* for libelants.

*Sidney Chubb,* for respondent.

BROWN, J. The nature of the cause, I think, sufficiently appears in the libel to answer the requirement of the twenty-third rule in admiralty. The second exception—that no cause of action is stated—goes to the merits of the action. It does not cover any mere informality of statement; nor any lack of fullness in detail, or of definiteness and certainty. The objection that there is no averment in the libel that communication was had with the owners of the cargo before executing the bottomry cannot, therefore, be considered. The general averments that the expense incurred was necessary; that the execution of bottomry was necessary, and that the master "lawfully executed the bottomry," are, I think, sufficient, except on special demurrer or special exception.

The general question presented is whether, upon a total loss of the Andrew Johnson and her cargo and freight, the ship-owner is bound to indemnify the owner of the 1,200 tons of cargo that arrived safely by the Leslie for what he paid on the bottomry bond to obtain his goods, so far as the bottomry loan was originally incurred for the benefit of the lost ship and freight. The amount claimed in the libel being only £1,617 4s. 3d., ($7,870.16,) it is to be inferred that the residue of nearly £1,000 was the amount of the expense included in the bottomry loan that was apportioned against the cargo; while the former sum was charged against the particular average of the Andrew Johnson and her freight to be earned. Through the total loss of the Andrew Johnson, and of that part of the cargo that remained on board of her, the respondent has already lost everything that he embarked in the adventure.

Upon the general question, two points have been discussed by counsel —*First*, whether, under the peculiar terms of the bottomry bond, the Leslie's part of the cargo was, upon the utter loss of the other ship, chargeable with any lien, and whether consequently the libelants were legally bound to pay anything to obtain possession of the Leslie's cargo; *second*, whether, if they were thus bound, there was any legal right of recourse against the owner of the Andrew Johnson, who had suffered a total loss of his own ship and freight. In the recent case of *Force* v. *Insurance Co.*, *ante*, 767, some consideration was given to the different provisions of bottomry instruments in regard to the risks assumed by the lender, and his right to salvage in what might remain after a total loss of the ship. In that case the bottomry instrument was a brief and informal draft; the present is a full and formal instrument of some 15 folios. The construction of the instrument itself is not free from difficulty. It is executed by James H. Killeran, as master of the ship Andrew Johnson. It recites in detail the principal facts, and continues.

"That Grace Brothers & Co. were contented to stand to and bear the risk, hazard, and adventure of said advances upon the hull, body, or keel of the said vessel, Andrew Johnson, together with the cargo laden on board as aforesaid, and the freight to be earned; * * * and that the said master doth hypothecate and charge the said vessel and her cargo, including that portion of the cargo transhipped to the Mary J. Leslie, and the freight to be earned and become payable in respect of said voyage, upon condition that if the said vessel shall forthwith set sail from Callao; * * * and if the above bounden James H. Killeran shall within the next five days after the arrival of the vessel at her final port of destination, and before commencing to discharge, pay to Grace Brothers & Co. the said advances, and the maritime premium thereon, * * * or if during the said voyage an utter loss of the said vessel by fire, enemies, pirates, the perils of the sea, or navigation, or any other casualty shall unavoidably happen, to be sufficiently proved by the said James H. Killeran, then and in either of the said cases this obligation shall be void, or otherwise to be and remain in full force and virtue."

The libelants contend that the words "the said vessel" in the condition of the bond apply equally to both the Andrew Johnson and the Mary J. Leslie. No doubt it was the expectation of the parties that both vessels alike would sail forthwith from Callao and deliver their cargoes, but the context scarcely admits of any literal application of the conditions to both vessels alike. It could not have been intended that the above bounden James H. Killeran, "master of the Andrew Johnson," should "within five days after the arrival" of the Leslie pay the amount of the bond, if his own vessel arrived safely, though more than five days later, at the same port. On the other hand, it is clear that the cargo transhipped to the Leslie was intended to be included in the bottomry. The final clause declares that in case of an utter loss by perils of the sea the obligation is to be void. There is no saving clause reserving to the lenders in case of such loss "any average that might be secured upon all salvage recoverable," as is usual in such full and formal instruments. *Insurance Co.* v. *Gossler*, 96 U. S. 645, 646. If such an instrument were construed upon the principles of the common law strictly, and if "the

said vessel" were held to mean the Andrew Johnson only, the whole instrument would become inoperative on the utter loss of that vessel, under the condition that the obligation should in that event be void. Considering, however, that this is a maritime instrument, to be construed liberally in favor of the bottomry lender, in support of its apparent or reasonable intention, and having regard to the provisions of nearly all the maritime codes, which give the lender a right in the salvage, though the vessel be lost, irrespective of the special phraseology of the instrument, I think that the "obligation" that by the condition is to become void may be fairly construed as intended to mean only the personal obligation or agreement to pay the loan; leaving the pledge operative upon any salvage recoverable, in the same manner as where the saving clause is embodied in the instrument.  *Force* v. *Insurance Co.*, *supra*.

If the above construction is correct, it would not be material that the words "said vessel" in the preceding paragraph literally meant the Andrew Johnson only; for the cargo which was brought safely by the Leslie was a part of the original cargo of the Andrew Johnson, and, being hypothecated by the bottomry instrument, that part of the cargo would continue subject to the bottomry lien, like any salvage from the wreck of the Johnson, precisely as if it had been rescued by the Leslie from the Johnson a few moments before the latter went down in mid-ocean. Assuming, therefore, that, as the libel states, "the libelants were bound in law to pay the bond in order to obtain their goods," though the libel does not state that the payment was made under the compulsion of any legal proceedings, the case of *Duncan* v. *Benson*, 1 Exch. 537, 3 Exch. 644, is cited as a direct adjudication that the ship-owner is bound to indemnify the libelants, as for money paid for his account. In that case the ship arrived with her cargo. The owner abandoned the ship and freight and refused to satisfy the bottomry. He was, nevertheless, held liable to indemnify the cargo-owner. In *Lloyd* v. *Ginbert*, L. R. 1 Q. B. 115, on the other hand, under precisely similar circumstances, the ship-owner was held not liable; because by the law of France, to which country the ship belonged, the ship-owner was absolved from all liability by abandonment of the ship and freight. By the law of England the ship-owner has no similar right to free himself from liability for the master's engagements by abandonment; and in the former case, therefore, the owner was held responsible, as for moneys in effect borrowed by the master from the cargo-owner for the purpose of repairing his ship; precisely as if he had sold a part of the cargo for the same purpose, in which case the owner's liability was not disputed.

Directly contrary to the case of *Duncan* v. *Benson*, was the decision of TANEY, C. J., in the case of *Naylor* v. *Baltzell*, Taney, 55, in which the owner of bottomried cargo, which had been sold in the enforcement of the bottomry bond, sued the owner of an American vessel for non-delivery of his cargo. The question of the extent of the ship-owner's liability was then fully considered, and it was held to be limited to the value of the ship and freight that comes to the ship-owner's hands. It was held that the master had no authority to bind the owner beyond that limit; and

that he could not, by a pledge of the cargo, indirectly extend the ship-owner's personal responsibility. "The justice and sound policy," says TANEY, C. J., "of the rule which restricts the power of the master over the property and fortune of his owner to the value of the ship intrusted to his command and the freight she may earn, is proved by its adoption by every commercial nation in Europe, and we should be very unwilling to establish a contrary principle in this country, unless very clear and decisive authorities compelled us to the decision; for it would place the American ship-owner in a far worse condition than his European rival, and compel him to hazard his whole fortune, however large, upon every distant voyage made by one of his ships." Since that decision was rendered the act of 1851, (Rev. St. § 4283,) applicable to at least all cases of loss and damage, and the recent act of June 26, 1884, (23 St. at Large, p. 57, c. 121, § 18,) extending the same exemption to all debts and liabilities generally, save for seamen's wages, have confirmed that adjudication. These acts were designed to bring the law of this country into harmony with the maritime law of most other countries in respect to the limitation of the liabilities of ship-owners arising from the navigation of their vessels, and the acts of masters, whether growing out of contract or tort. *Norwich Co.* v. *Wright*, 13 Wall. 104, 119, 121. It is immaterial which law be looked to as the law of the contract in this case; whether the law of this country, as that of the ship's home; the law of Peru, where the contract was made; or that of Hamburg, where it was to be performed,—since the law of all three on this point is now in substantial accord. 2 Desjardins, Droit Com. Mar. §§ 280, 282; *Force* v. *Providence, supra.* By neither is the ship-owner answerable after the utter loss of ship and freight, unless he is chargeable with some personal privity or fault, and that is not here alleged. The exception to the libel on the merits is therefore sustained.