### BOLTEN *v.* THE JAMES L. PENDERGAST.

(*District Court, S. D. New York.* March 31, 1887.)

1. **BOTTOMRY—NOTE FOR SUPPLIES—MORTGAGE.**

   A note given by the master in a foreign port by the owner's authority for necessary supplies, pledging the vessel for the payment 10 days after completion of her voyage, is a valid bottomry lien, and outranks a prior mortgage.

2. **SAME—ARREST—RELEASE UNDER AGREEMENT—LIEN CONTINUED.**

   The vessel having been libeled at Boston to enforce the bottomry, and being in custody of the marshal, was released, and that suit discontinued, upon a written agreement between the parties that she should go to New York to take in cargo, and that the existing lien for bottomry should remain in full force, to be enforced in the district court of New York or New Jersey, by libel or otherwise, on arrival, and that the owner should pay all court expenses in Boston on arrival, to be secured as part of the lien. *Held,* upon the arrival of the vessel in New York, under the agreement, that the libelant had a valid maritime lien for the amount due on the bottomry note, as well as for the court expenses in Boston, excluding, however, additional counsel fees.

3. **SAME—NEW CHARTER—RE-ARREST—MARSHAL'S AUTHORITY—LOADING WHILE IN CUSTODY—DELAY—DAMAGES.**

   The defendant, upon the above agreement, insisting that, before settling the bottomry claim, he had an option to send the vessel to Bayonne, New Jersey, to load under a charter which did not name the particular place of loading, *held* inconsistent with the written agreement; that loading without the charterer's knowledge of the lien, and of the agreement for enforcing it, could not proceed without bad faith to the charterer, before a new arrest by the marshal; that the marshal had no authority to permit loading without notice after arrest; and that the owner's damages, through delay in not loading under the charter after the re-arrest, were through his own delay in settling for the lien, or releasing the vessel under stipulation, and that there was no cause of action or offset against the bottomry creditor therefor.

In Admiralty.

*Jas. K. Hill, Wing & Shoudy,* and *H. Putnam,* for libelant.

*Whitehead, Parker & Dexter,* for claimants.

BROWN, J. The libel in the above cause was filed to recover the sum of $1,592.50, upon a draft drawn and negotiated to the libelant by the master of the James L. Pendergast at Hamburg, May 7, 1886, for £325, payable 10 days after arrival at Boston, Massachusetts, at the office of the consignees. The last clause of the draft is as follows: "Value received, for the necessary use and outfit for the said vessel, and for the payment of which I hold my vessel, owners, and freight responsible."

The proofs leave no doubt that the draft was drawn to obtain necessaries for the ship at Hamburg, and in form and substance by the authority of Mr. Pendergast, who was the equitable and managing owner.

It became, therefore, a lien by bottomry upon the vessel.  *Force* v. *Pride of the Ocean*, 3 Fed. Rep. 162; *The Giulio*, 27 Fed. Rep. 318, 319.

Upon the arrival of the vessel at Boston, she was arrested by the marshal under a libel to enforce this demand.  The managing owner being in New York, and desiring that she should load here, after several interviews with Tobias & Co., the agents of the libelant in New York, made an arrangement by which she might be brought here, which, so far as respects Mr. Pendergast's obligations and their conditions, was embodied in the following letter:

"*Messrs. C. Tobias & Co.*—GENT.: As a favor and convenience to me, I request you to discontinue your action in the district court of Massachusetts against bark Jas. L. Pendergast, for the collection of a draft of £325.  It is important that the vessel come here to New York to take in cargo, and, in consideration of your consent to such removal, I agree that all lien you or your correspondents now have against said vessel shall remain in full force, and consent that you may enforce your claim in the district court of New York or New Jersey, by libel or otherwise, on the arrival of the vessel.  I agree also that all court expenses in Boston will be paid here, on arrival of vessel, and secured as part of said lien on said vessel.

                                                            "JAS. F. PENDERGAST,
"*New York, July* 28, 1886.              Agent for Owners and Mortgagee."

Thereupon the libelant discontinued the suit in Boston, released the vessel from custody, filed the libel in the present cause in this district on July 30th, two days after the delivery of the above letter, procured a special deputy-marshal to be appointed, who went to Boston, and sailed on board the bark for this port, and arrested her under the process in this cause as soon as she came within the jurisdiction.  Some time after the arrest in this district, the surviving partners of E. D. Morgan & Co., mortgagees of the vessel under a mortgage dated January 3, 1873, intervened for their interests, and procured a release of the vessel upon the usual stipulation.  The original answer, in effect, stated that the sum of $10,000 was due upon their mortgage, and contested any lien in behalf of the libelant, and denied that the claim in suit was a prior lien to their own, and averred that the vessel was worth much less than the mortgage debt.  By an amendment to their answer, it was averred that the agreement in respect to the removal of the vessel to this district was that said vessel was to be taken from Boston to Bayonne, New Jersey, to take in cargo under a charter already made, and that the libelant's claim should be paid out of an advance to be made by the charterers; that the libelant, upon arrival at New York, refused to permit the vessel to proceed to Bayonne, as agreed, but seized and detained her within this jurisdiction.

The evidence does not sustain the averments of the amended answer to the extent claimed.  There was no agreement that the vessel should go to Bayonne, or that the libelant's claim should be paid out of the expected advance.  The entire charter money was in fact but little in excess of the claims in suit.  The proof establishes no agreement beyond the propositions contained in the letter above quoted, which the libelant, through his agent, at once accepted, and acted upon.  The evidence does show, however, that the charter of the bark, which had been made six

days before, gave the charterers, according to the custom of the port of New York, a right to load her about the waters of New York or at Perth Amboy or Bayonne, New Jersey. But when the letter was signed by Mr. Pendergast and accepted and acted upon by the libelant, none of the parties knew to which of these places the charterers would wish the bark to be sent.

The proceedings on the part of the libelant have been in exact accordance with the provisions of Mr. Pendergast's letter. The complaint now made of the libelant, in effect, is that, after the vessel had arrived, and was in the custody of the marshal, he did not permit her to go to Bayonne, in the district of New Jersey, to load, before the settlement of the libelant's claims; or else that he did not forbear to arrest her, either here or in the New Jersey district, until after she had gone to Bayonne, and secured an advance from the charterer. There is nothing in the agreement, however, and nothing in the circumstances from which it could be rightly inferred, or upon which Mr. Pendergast had any right to suppose, that the vessel was to be loaded, and the advance obtained from the charterer, before some definite arrangement was effected for the settlement of the libelant's claims. No such arrangement was even proposed, except a partial and insufficient arrangement to go to Bayonne and load. Without some arrangement to which both the libelant and the charterer were parties, the loading could not go on consistently with the provisions of the agreement, nor in the mode now contended for by the respondent, without a species of fraud upon the charterer. No such arrangement is provided for in the agreement, and none was made afterwards.

The marshal has no authority to permit a vessel to be incumbered by unnecessary additional charges and liens while she is in his possession. *The Aline*, 1 Wm. Rob. 112, 122; *Muir v. The Brisk*, 4 Ben. 252; *The Grape-Shot*, 22 Fed. Rep. 123–125; *The C. L. Bayliss*, 25 Fed. Rep. 862; *The Young America, post*, 789. A lien for the completion of the charter would arise the moment cargo was loaded under the charter, while she could not sail unless the claim in suit were settled. It is not contended that any advance of the charter money could be secured until the vessel was loaded, wholly or in part. And it is not only a matter of clear common sense, but the charterer's testimony shows, that the charterer would not knowingly load a vessel, much less make any advances of freight, while she was in the custody of the marshal upon a lien nearly equaling the whole charter money, unless some mode of settlement satisfactory to the charterer were agreed on that would not involve either delay in sailing, or loss to him. It would be a fraud upon the charterer, on the one hand, to conceal from him the marshal's custody and possession while taking the charterer's cargo on board, and obtaining an advance thereon; and it would be equally a virtual fraud upon him for the parties, by agreement, to send the vessel to be loaded by him, and to get an advance thereon, with the intent to libel and arrest her as soon as the advance on the loaded cargo should be obtained. The latter procedure, moreover, would involve no little delay on the libelant's part in enforc-

ing his lien; whereas the written agreement provides expressly that the libelant may proceed by libel or otherwise, "on the arrival of the vessel;" that is, immediately on her arrival here, and without any delay. There was in fact no way for the owners of the vessel to proceed consistently with the agreement, or without a virtual fraud on the charterer, except by the immediate settlement or arrangement of the libelant's claim, upon the arrival of the bark in New York, and before taking any cargo on board.

It is clear that the libelant had no motive or intent to engage in any such irregular proceedings. Mr. Pendergast's intent, I think, was only to get the vessel here, and then to arrange for her release through the aid of the charter and the expected advance, in some proper way. The agreement with the libelant did not provide for this subsequent arrangement, but only to bring the vessel here, subject to the liens on her. After she arrived, instead of arranging for her release, Mr. Pendergast demanded that she should be sent to Bayonne to load, without a further arrangement of any kind. This was not in accordance with the agreement, nor was it practicable without irregularity or virtual fraud. There was nothing to prevent the immediate release of the vessel on her arrival here, upon stipulation in this court, as was afterwards effected. She could then have proceeded to Bayonne at once to load under the charter. This is the natural import of the agreement, and the only construction legally practicable. There was no legal damage to the respondents, except such as arose from their own delay. The provisions and conditions now sought to be ingrafted upon the written agreement by parol evidence are not only indefinite and irregular, but wholly incompatible with the terms and legal effect of the agreement. The new contract for the continuance of the lien having been therefore observed by the libelant, and being a maritime contract upon good consideration, must be enforced according to its clear purport; even though the original lien were held to have expired on the discontinuance and release of the vessel from custody at Boston, which, under the circumstances, is doubtful. *The Wm. Murtagh,* 17 Fed. Rep. 259, 264; *The Jack Jewett,* 2 Ben. 353; *The Thales,* 3 Ben. 327, 10 Blatchf. 203; *The Nahor,* 9 Fed. Rep. 213.

The libelant is therefore entitled to the amount of the draft, and interest, together with such marshal's fees and court expenses in Boston as were taxable upon the discontinuance of the suit there; also $47 paid for seamen's wages, with $4.10 port charges, with the costs of this action; but excluding other counsel fees in Boston.