## BERRY v. GRACE et al.[1]

### (District Court, S. D. New York. June 20, 1894.)

CHARTER PARTY—CARGO FORWARDED FROM PORT OF DISTRESS — ADVANCES—
BOTTOMRY—RIGHT OF FORWARDING VESSEL TO FREIGHT—PRIORITIES.

Charterers of the ship Y. to carry a cargo from Taltal and Pisagua to New York, at a freight of 17 shillings per ton, made advances, pursuant to provisions of the charter, for which the master of the Y. gave a bottomry note, payable three days after arrival of the Y. at New York, which assigned the freight to pay for such advances. After sailing, the Y. was obliged to put into Callao in distress, where, with the consent of all parties, including the charterers, the ship M. was chartered to carry part of the Y.'s cargo to New York, at the rate of 12 shillings per ton. The M.'s bill of lading, however, called for freight at 17 shillings, the master of the M. giving to the master of the Y. an obligation to repay to the latter the difference of 5 shillings per ton. There was no evidence that the master of the M. had knowledge of the prepayment of any part of the freight to the Y. The Y. sailed from Callao, and was wrecked, and became a total loss. The M. arrived safely in New York, when the charterers claimed to deduct from the freight called for by the bill of lading the entire advances made to the Y. *Held*, that the M., as an independent carrier, properly obtained in a port of distress by the Y., had the right, under the ordinary provisions of the maritime law, to the payment of her own freight, without reference to any previous arrangement between the Y. and the cargo owner of which she had no knowledge; that the bottomry, which hypothecated the freight to secure the advances, was liable to be postponed by subsequent maritime obligations necessarily incurred in order to complete the voyage, and the charter of the M. was a necessary expense of this kind; that such hypothecation, therefore, as against the M.'s claim, only extended to the 5 shillings per ton agreed to be returned by the M. to the Y., which the charterers were entitled, under the bottomry, to retain; but that they were liable for the balance of the freight at the rate of 12 shillings per ton.

This was a libel by Benjamin F. Berry against William R. Grace and others for a balance of freight under a charter party.

Wing, Shoudy & Putnam, for libelant.
MacFarland & Parkin, for respondents.

BROWN, District Judge. By charter made March 28, 1892, the respondents chartered the Yorktown for a voyage from Taltal and Pisagua to carry nitrates to New York on respondents' account, freight to be paid at and after the rate of 17 shillings per ton. Clause 17 of the charter provided that the charterers should supply the master in Valparaiso, or loading port, with such advances as might be necessary, not exceeding £———, which, with the cost of insurance thereof, was to be reimbursed by the master in cash immediately after the arrival of the vessel at the port of discharge; and that any contributions to general average losses, which, if any, should become payable in respect to such advances, should be borne and paid by the owners. The vessel took on board 2,750 tons of nitrates, and the charterers advanced to the master £577.16.11. This was indorsed on the Yorktown's bill of lading as an advance of freight; and as such, it was insured at an expense of $115.60, which was charged to the owners of the ship. The master at the same time

[1] Reported by E. G. Benedict, Esq., of the New York bar.

executed a bottomry note, dated July 23, 1892, which recited the receipt of the £577.16.11 for advances and necessary disbursements to enable the vessel to proceed on her voyage, which he promised "to pay to said Grace & Co., or to their assigns, or on their order, three days after the arrival of said vessel (Yorktown) at the said port of New York, or at any other port at which the present voyage may end. * * *" The note then provides as follows:

"And for the payment of the said sum, together with the cost of insurance thereon, I hereby bind my said vessel and her owners; and I assign and transfer so much of the freight money as may be necessary, and authorize the said Grace & Co., their assigns and indorsees, to receive and collect such freight money at the port of discharge; and should any contribution to general average losses become payable in respect of the advances aforesaid, it shall be borne and paid by the owners."

The Yorktown, soon after sailing, met with disaster, and was compelled to put into Callao in distress, where she arrived August 12, 1892. For the purpose of lightening the ship according to the recommendation of surveyors, about 1,050 tons were taken out of the Yorktown and stored in the ship Mohican. Afterwards, with the consent and approval of all parties interested, including the respondents, who had a mercantile house at Callao, the Mohican was chartered to carry forward the cargo stored on her to New York, at the rate of 12 shillings per ton. One of the partners of Grace Bros. & Co. assisted in the negotiations of this charter, which was deemed best for all concerned. On October 3, the Yorktown sailed from Callao to New York with about 1,620 tons, more or less; but after rounding Cape Horn she was wrecked on the coast of Brazil, and became with her cargo a total loss. The Mohican, pursuant to her charter, sailed from Callao on October 5, with 1,028 tons of the Yorktown's original cargo on board, and arrived in New York on the 26th of March, 1893.

The Mohican's bill of lading recited the shipment to have been made by the master of the Yorktown, and provided for payment of freight on delivery at New York to respondents' bankers, at the rate of 17 shillings per ton, the original charter price of the Yorktown. At the same time the master of the Mohican gave to the master of the Yorktown an obligation to repay to the latter the difference of 5 shillings freight per ton. The respondents in New York, on receipt of the Mohican's cargo, claimed to deduct from the freight due on the Mohican's bill of lading the entire advance originally made to the Yorktown, paid the sum of about $1,100 remaining after such deduction, and refused to pay more. The sum paid gave to the Mohican only about one-third of her contract price for forwarding the cargo, according to her own charter rate of 12 shillings per ton. The libelant sues to recover the whole balance, at the rate of 17 shillings per ton for the amount delivered, without any deduction for the advances made to the master of the Yorktown.

Where an advance on account of freight has been made before the ship sails, and a part of the cargo is lost during the voyage, it is sometimes difficult to determine on what part of the cargo the paid freight is to be applied, viz., whether wholly upon the part lost, or wholly upon what is delivered, or upon both, pro rata. In the case of Mat-

thews v. Gibbs, 30 Law J. Q. B. pt. 2, p. 55, a case in some respects like the present, it was decided that the forwarding vessel, upon a transshipment of cargo by the master in a port of distress, could not recover, after she had received her own freight in full, the residue of the original charter rates for the benefit of the original charterer, to the prejudice of the shipper, by excluding all deduction for the shipper's original advances on account of freight; since that would operate as a fraud on the shipper; and a reshipment by the first master on such terms would be in excess of his authority. To the extent of five shillings per ton, that case is pertinent here, but no further. The right of the forwarding vessel in that case to her own freight in full, was not disputed, but was paid before suit was brought.

In the case of Allison v. Insurance Co., L. R. 1 App. Cas. 209, one-half of the freight on the cargo was paid in advance upon its shipment at Glasgow; the balance was to be paid on delivery at Bombay; the shipowner insured with the defendant his freight up to the amount unpaid. On the voyage, one-half of the cargo was lost through sea perils; the remaining half was delivered to the consignee at Bombay. The master on delivery did not claim the other half of the freight, and the shipowner sued his insurers to recover it as lost, through the loss of half of the cargo. The plaintiff had judgment in the court of common pleas, which was reversed on appeal by the court of exchequer chamber. On appeal to the house of lords, the question was elaborately discussed. All the judges agreed that the question should turn on the right of the master at Bombay to claim any further payment of freight upon the cargo delivered. It was held that the master could not have recovered the unpaid freight of the consignee at Bombay, but that it was covered by the insurance, and the judgment of the exchequer chamber was reversed, and that of the common pleas affirmed.

The case last cited, however, was not a case of the transshipment of goods in a port of distress; nor was the advance made on bottomry; nor was the advance insured on owner's account, and at his expense; and in the decision, the special language of the charter, and the presumed intention of the parties, had a controlling influence. Here the shipment on the Mohican was for the benefit of all concerned. There was no expectation that the Yorktown would be lost after leaving Callao; and her freight, payable on the delivery of her own remaining part of the cargo at New York, would be far more than sufficient to repay the original advances. The provision that the Mohican should collect 17 shillings per ton freight was, therefore, a proper provision for the protection of the Yorktown's interest in the freights, and is not in the least indicative of any intent, as in Matthews v. Gibbs, supra, to exclude the repayment of the advances out of the freights on the cargo remaining on the Yorktown.

But it is claimed by the respondents, that inasmuch as the shipment on the Mohican was made in the name of the master of the Yorktown, her voyage was made merely on account of the York-

town; and that the Mohican, therefore, stands precisely in the place of the Yorktown, and can recover no more than the Yorktown herself could have recovered had she arrived in New York and delivered the Mohican's cargo, and no more.

Several considerations, however, seem to me conclusive against the application of such a rule in this case: First, the reshipment was made in a port of distress; it was an act of necessity, for the best interest of all concerned; and for such a service, rendered to all, the Mohican is entitled to the compensation agreed to be paid her. Had her stipulated freight been higher than the original price, she could have recovered it under our law without question. 3 Kent, Comm. 212. The same is the law of France. Code de Com. §§ 296, 393. She is not affected by the mutual obligations of prior interests any further than she is shown to have assumed them. Any such assumption to the prejudice of her own compensation is not to be presumed. The reshipment by a bill of lading in the master's name, and at the original 17 shillings freight, is no evidence of any such assumption, but as I have said, was merely a proper provision to secure the Yorktown's interests; just as the provision for a delivery of the cargo to the respondents' bankers was for their interest.

Second, the note given for the advances was an express instrument of bottomry. The Pride of the Ocean, 3 Fed. 162; The J. L. Pendergast, 30 Fed. 717, 718. This determines conclusively, so far as it extends, the intention and the rights of the parties. That instrument made the personal obligation to repay the advances conditional upon the arrival of the Yorktown; and the Yorktown never arrived. The condition upon which repayment was to be made was never performed; and all personal obligation to pay was therefore lost. To cover that contingency, insurance upon the advance of freight was effected by the respondents at the expense of the owners of the Yorktown, and for the benefit of whom it might concern. The insurance was for the benefit of the Yorktown, as well as of Grace & Co. The owners of that ship are, therefore, equitably entitled to the benefit of that insurance.

The instrument of bottomry, however, contained, besides the conditional personal obligation to pay, a further express pledge of the freights; that is, the freights unpaid upon the whole cargo, as a further security for the repayment of the advances. In such a case, where the contingency of a separation of the cargo through a necessary transshipment of a part upon another vessel in a port of distress has not been contemplated and provided for, I think that the bottomry bond takes effect upon so much of the cargo and freights remaining as were delivered at the port of discharge, though by another vessel; on the same principle that holds any salvage recovered applicable on the bottomry debt, where the ship is lost, though salvage is not expressly named. See Miller v. O'Brien, 35 Fed. 779, and 59 Fed. 621, and cases there cited. This is but a reasonable construction, and is necessary to carry out the evident intention of the parties in making the express pledge of all the

freights. I think the freight upon the cargo delivered by the Mohican was, therefore, bound by the original bottomry note.

But this original bottomry of all freights that might become due, like all other bottomry obligations, was liable to be postponed by subsequent maritime obligations necessarily incurred in order to complete the voyage, and to earn the very freights previously hypothecated. The charter of the Mohican (after the disaster to the Yorktown) was a necessary expense of this precise kind. Without this charter, or some other greater expense, these hypothecated freights could not have been earned. The charter of the Mohican being a necessity, within the master's authority, and proper in all its parts; and being for the benefit of the respondents as cargo owners and as holders of bottomry on freights, as much as for the benefit of the Yorktown as carrier, and inuring directly to the respondents' interest, it was superior in merit and in privilege to the prior bottomry claim; and the respondents, therefore, cannot set up their bottomry hypothecation of freights to the prejudice of the Mohican's own charter hire.

The above principles would have been applicable, even had the transshipment been made at a port where the respondents were not present or represented, and had had nothing to do with the transshipment. But in the present case, the respondents were present by one of their partners, and had full knowledge of, and participated in, all that was done.

There is nothing in the evidence to indicate that the master of the Mohican in forwarding the cargo was the mere servant or employé of the Yorktown; or that he acted in the mere interest of the Yorktown. On the contrary, the evidence is in entire accord with the ordinary presumption, that he acted as an independent carrier, properly obtained in a port of distress by the master of the Yorktown, to transport the cargo which the Yorktown had become unable to carry; and that he acted under the ordinary provisions of the maritime law, which give him priority for his freight over antecedent claims. The Mohican delivered the cargo upon her own bill of lading only, as I interpret the testimony. The reference to the Yorktown, inserted at New York, was made only for the purposes of customhouse entry, and for the consignee's convenience. For her necessary and beneficial service to all concerned, the Mohican had the right to the payment of her own freight, whatever it might be, without reference to any previous arrangements between the Yorktown and the cargo owners, to which she was in no way privy.

There is no evidence that the master of the Mohican had any knowledge of the prepayment of any part of the freight to the Yorktown; and it is quite obvious that the charter at Callao was not made upon any expected deduction of the respondents' advances from her freight of 12 shillings per ton. Had the master of the Mohican known of these advances, I do not see how it could have concerned him; and if Grace & Co., who negotiated the charter at Callao, had had any purpose of charging those advances against the Mohican's freight, they were equitably bound to acquaint her with

that claim at the time the charter was made. Had any such notice been given, it is certain that the Mohican would have refused any such charter. As no such claim was made then, the respondents are equitably estopped from setting it up now.

I have treated the matter partly on the basis of the bottomry note, because that instrument states the terms of the respondents' advances; and, therefore, the rights of the respondents to repayment or offset on account of the advances are limited by that instrument. The hypothecation is good as against the five shillings per ton agreed by the Mohican to be paid to the master of the Yorktown, because that was freight earned for the benefit of the Yorktown, and not for the Mohican. The Mohican has no right to that. To that extent, the case of Matthews v. Gibbs, supra, is applicable. That part being covered, in my judgment, by the bottomry instrument, and having become necessary to the respondents' security through the unexpected loss of the Yorktown's remaining part of the cargo, the respondents have the right to retain the 5 shillings out of the 17 shillings per ton on the Mohican's cargo. The rights of the Yorktown growing out of the insurance cannot be settled in this suit, to which her owners are not parties.

The libelant is entitled to be paid at the rate of 12 shillings per ton, and to a decree for so much, less the amount of $1,100 heretofore paid, with interest and costs.