## O'BRIEN v. MILLER et al.

(Circuit Court of Appeals, Second Circuit. April 16, 1895.)

1. **Shipping—Construction of Bottomry Bond—Transshipment of Cargo—Voluntary Payment.**

In a port of refuge a portion of the cargo was transshipped, and the master gave a bottomry bond which covered this, as well as the ship herself and the balance of her cargo. The bond was conditioned to be void if the "said vessel" should be utterly lost by a peril of the sea. The vessel and the cargo in her were totally lost through a collision. *Held,* that the bond was not to be construed as being void only upon the condition that both the vessel herself and the vessel containing the transshipped cargo were lost, but must be interpreted, according to the plain meaning of its terms, as becoming void upon the loss of the vessel herself; and therefore a payment of the bond by the consignees of the transshipped cargo, in order to obtain possession thereof, was a voluntary payment, and could not be recovered by them from the vessel's owners, although the latter had recovered damages for her loss from the vessel with which she collided. 59 Fed. 621, reversed.

2. **Same.**

The bond could not be sustained, as against the transshipped cargo, upon the theory that the same was to be treated as salvage from the wreck of the vessel which was lost; for it was in no sense "cargo laden on board" of her on the voyage from the port of refuge to her destination, which was the voyage upon which the bottomry lender had staked his money.

3. **Same—Collision—Rights of Bottomry Lender.**

Quaere, whether a bottomry lender upon a vessel totally lost in collision is entitled to recover damages against the offending vessel, or against the owner of the lost vessel after the offending vessel has made restitution to him.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by Brice Alan Miller and others against Edward E. O'Brien to recover money alleged to be due as contribution for

the payment of a bottomry bond which libelants discharged, as they alleged, in order to obtain possession of cargo consigned to them. The cause was heard in the district court upon exceptions to the libel, which were in part overruled and in part sustained. 35 Fed. 779. After the filing of amended libels, a decree was finally rendered in favor of libelants. 59 Fed. 621. The respondent appeals.

George A. Black, for appellant.
Wilhelm Mynderse, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. In June and July, 1884, the libelants shipped on board the Andrew Johnson,—a ship owned by the respondent,—at Iquique Bay and Caleta Buena, 19,943 bags of soda, to be transported on said vessel to Hamburg, Germany, and there to be delivered to the order of Anthony Gibbs & Sons, of London. Soon after sailing, the Andrew Johnson encountered heavy weather and met with disaster, whereupon she put into Callao, as a port of refuge. Surveys were held, and, in accordance with the recommendation of the surveyors, she was lightened by the discharge of part of her cargo, repairs were made to the vessel, and 1,130 tons of her cargo forwarded to Hamburg by another vessel,—the Mary J. Leslie; the shipment being made thereon in the name of J. H. Killeran, as master of the Andrew Johnson. For the necessities incident to the port of refuge, the repairs of his vessel, the discharge, warehousing, reshipment, and stowage of cargo, the master incurred expenses aggregating about £2,212; largely for handling cargo and transshipping cargo, the repairs to the ship not being of a permanent nature. In order to raise funds to meet these expenses, the master made a bottomry bond, dated September 15, 1884, which will be hereinafter more specifically set forth, to the firm of Grace Bros. & Co., for the amount of such advances, with a bottomry premium of 17½ per cent., making an aggregate obligation of £2,599. 8s. 9d. For the payment of this bond he bound, obligated, and hypothecated the Andrew Johnson, her boats and apparel, and her cargo, including that portion of the cargo transshipped to the Mary J. Leslie, and his freight. The portion of cargo transshipped to the Leslie, and the Andrew Johnson, with the cargo remaining on her were, respectively, worth several times the amount of the bond. The two vessels sailed from Callao for Hamburg, carrying their respective lots of cargo. The Andrew Johnson came into collision with the British ship Thirlmere, and was sunk in mid ocean, no part of her apparel or cargo being saved; the Leslie arrived in regular course at Hamburg on February 5, 1885. Her cargo was to be received for the consignees by Hugo Wirtz, a broker residing in Hamburg. On February 10th the representatives of Baring Bros. & Co., of London, acting on behalf of the owners of the bond, demanded payment of it in full from Wirtz; and on February 11th the representatives of the bondholders and of the consignee of cargo entered into an agreement

that the claim against the cargo should be withdrawn, in consideration of Anthony Gibbs & Co. engaging to pay whatever proportion of the bond might be found to be legally due from the cargo of the Leslie, the question to be submitted to certain eminent and leading lawyers of Hamburg. Thereupon the discharge of the cargo was commenced and completed. The precise date when the Andrew Johnson and her cargo were lost does not appear in the record, but the fact of such loss was known in Hamburg when the question as to the effect of such loss was considered by the eminent lawyers to whom it was referred. Neither the shipowner nor the master, nor any representative of either, was a party to, or informed of, or present at the proceedings had before the Hamburg referees, nor, so far as appears, was there a scintilla of evidence before them, except the bond and the bill of lading, as to the intention of the contracting parties. The conclusion of the Hamburg lawyers is as follows:

"Some doubt might be raised as to whether, according to the wording of the bottomry bond, the money was not lent, or appear to be lent, contingent upon the safety of the Andrew Johnson, and becoming due only after her arrival at her port of destination, but becoming null and void in the event of her nonarrival. We are of opinion, however, that this interpretation is not consistent with the real intention of the contracting parties, and that the wording referred to has originated in the not sufficiently careful use and employment of a form of bond which happened to be at hand. This seems the less doubtful to us for this reason: that if the bottomry bond were interpreted in this manner the cargo of the Mary J. Leslie would be entirely liberated after the loss of the Andrew Johnson occurred, and would not even bear a portion of the bottomry debt, which nevertheless has arisen out of a case of general average. Manifestly, this cannot have been the intention of the parties interested."

The gentlemen who gave this opinion have been examined, and they testify that such "opinion agrees with the laws administered in Hamburg"; undoubtedly meaning thereby that, if the intention of the parties was as they found it, the conclusion they arrived at was correct. Both of them further testified that the law prevailing at Hamburg does not prohibit parties to a bottomry and respondentia bond from making an agreement that, if the vessel hypothecated by it be lost by a peril of the sea, the bond shall thereby become void. The provisions of the General German Commercial Code which have been put in evidence in no way conflict with this statement of the expert witnesses as to the parties' power to contract to take the hazard of the vessel's survival. Upon the announcement of this decision of the Hamburg arbitrators, Anthony Gibbs & Sons, for cargo owners, paid to Baring Bros. & Co., for bondholder, the full sum of £2,592. 8s. 9d.

The collision by which the Andrew Johnson and her cargo were sunk was due solely to the fault of the Thirlmere. The owner of the Johnson sued the owners of the Thirlmere in the proper English court, in which suit the present libelants (cargo owners) appeared. The owners of the Thirlmere limited their liability, under the provisions of the British act, to £8 per ton, which resulted in a fund insufficient to pay all the losses in full. The result was that the owner of the Johnson received £5,179 on ac-

count of the loss of his ship, and £858 on account of his freight, and the libelants here the proportion of the value of the Thirlmere which was adjudged to them as owners of the cargo laden on the Andrew Johnson, but the precise sum does not appear in this record. The expenses incurred in Callao, for which the money was borrowed on the bottomry bond, were, as has been before stated, in part chargeable to ship, and in part to cargo. Having had an adjustment made in London, the libelants, who had paid the bottomry bond, brought this suit against the owner of the Johnson, in personam, to recover the share of such general and special charges in the port of refuge properly falling upon the vessel, which libelants aver they had to pay in Hamburg in order to redeem their cargo on the Leslie from the lien of the bond. Readjustment of some of the items having been made by a commissioner, the district court found in favor of the libelants for $6,091.73, with interests and costs. 59 Fed. 621.

It is manifest that the libelants cannot maintain this action unless the bond was a valid obligation when the adventure terminated. The master of the Andrew Johnson left no debts behind him for work or supplies obtained by him in the port of refuge. All persons who furnished such work or supplies were fully paid, any liens they had therefor discharged, and all indebtedness to them fully extinguished. He secured the means thus to clear ship and cargo from all such claims by borrowing the money from Grace Bros. & Co., under a contract which he negotiated with them. If Grace Bros. & Co. had furnished this money as an unsecured loan, no one would contend that the cargo owner would have the right to intrude himself into the arrangement, volunteer to repay the loan, and then insist that the ship owner should pay him in whole or in part. It is only upon the theory that, by his negotiations with Grace Bros. & Co., the master of the Johnson so pledged the cargo sent by the Leslie that when it arrived in Hamburg it was bound to pay the money borrowed, or some part of it, that the cargo owner can contend that such payment was one to which Johnson or its owner should contribute. But if the master borrowed the money upon such terms that in the event of the happening of a specified contingency the cargo should be relieved from all obligation to pay, and, such contingency happening, the cargo owner nevertheless pays the loan, such payment is a voluntary one, so far as the ship owner is concerned; and it does not cease to be voluntary as to him because it is made in consequence of an unwarranted claim of the lender, or in accordance with an arbitration to which the ship owner is not a party.

The bond was executed in triplicate on September 15, 1884, by the master, in the presence of two witnesses, and acknowledged before the United States consul in Callao. It is no brief and informal draft or memorandum. Omitting a few immaterial words and clauses, it reads as follows:

"Know all men by these presents, that I, James H. Killeran, master mariner and commander of the ship Andrew Johnson, of Thomas, Maine, of the measurement," etc., "now lying in the port of Callao, am held and firmly

bound to Messrs. Grace Bros. & Co., of," etc., "in the penal sum of * * * £2,212, to be paid to the said Grace Bros. & Co., or any of them," etc.

"For which payment to be well and faithfully made I bind myself, my heirs," etc., "and also the hull, boats, tackle, apparel, and furniture of the said vessel, and her cargo of nitrate soda, including about 1,200 tons of nitrate of soda transshipped on board the British bark Mary J. Leslie, of," etc., "and the freight to be earned and become payable in respect thereof, firmly by these presents. Sealed," etc., "Dated," etc.

"Whereas the *said vessel* lately sailed," etc., "* * * sprang a leak, * * * bore up to Callao, * * * was duly surveyed, * * * and certain repairs were recommended to be done to enable the *said vessel* to continue the voyage with safety, and also to transship to another vessel about 1,200 tons of the cargo laden on board the aforesaid Andrew Johnson, in order to enable her to proceed on her voyage with perfect safety.

"And whereas, all necessary repairs and supplies have been made to the *said vessel*, and the said portion of cargo transshipped to the Mary J. Leslie to enable her to prosecute her said voyage, and she is now in a seaworthy condition, and ready to proceed to sea, but the said James H. Killeran having unavoidably incurred certain debts for such repairs, and other necessary and lawful matters and things relating to his *said vessel*, which he is totally unable to defray and make good, save and except upon the security of the bottom of his *said vessel* and her cargo and freight, hath been necessitated to raise the sum of * * * £2,212 for the payment of the debts incurred as aforesaid, and to enable the *said vessel* to proceed to sea on the said intended voyage, and which sum the said master has been unable to obtain on his own credit, or that of the owners of the *said vessel*, or in any other way than by bottomry and hypothecation of the *said vessel*, her boats, apparel, cargo, and freight.

"And whereas, the said Grace Bros. & Co. have, at the request of the above-bounden James H. Killeran, agreed to lend and advance to him the sum of * * * £2,212, * * * for the purpose aforesaid, upon his executing this present bond or obligation, and hypothecation of the *said vessel*, her boats and apparel, and her cargo, including that portion of the cargo transshipped to the Mary J. Leslie, and the freight to be earned and become payable in respect of the said voyage, and the said Grace Bros. & Co. are contented to stand to and bear the risk, hazard, and adventure thereof upon the hull, body, or keel of the *said vessel*, Andrew Johnson, her boats, tackle, apparel, and furniture, together with the cargo laden on board as aforesaid, and the freight to be earned and become payable as aforesaid, and for securing the repayment of the said sum, * * * the loan whereof is hereby acknowledged, he, the said James H. Killeran, doth by these presents mortgage, hypothecate, and charge the *said vessel*, her boats, tackle, apparel, and furniture, and her cargo, including that portion of the cargo transshipped to the Mary J. Leslie, and the freight to be earned and become payable in respect of the said voyage, unto the said Grace Bros. & Co., their executors," etc.

"Now, the condition of this obligation is such that if the *said vessel* shall forthwith set sail from Callao aforesaid, and without unnecessary delay or deviation proceed on her intended voyage to Hamburg, and if the above-bounden James H. Killeran shall and do within the space of five days next after the arrival of the vessel at her final port of destination, and before commencing to discharge the cargo, free of any average whatever, at the then current rate of exchange on London, well and truly pay, or cause to be paid, unto the said Grace Bros. & Co.," etc., "upon the present obligation, the sum of £2,212," etc., "being the principal money of this obligation, and the further sum of £387 for the maritime interest or bottomry premium thereon, at the rate of seventeen pounds ten per centum, making together £2,599," etc.

"Or if, during said voyage, an utter loss of the *said vessel*, by fire, enemies, pirates, the perils of the sea or navigation, or any other casualty, shall unavoidably happen," etc., "then and in either of the said cases this obligation shall be void, or otherwise to be and remain in full force and virtue."

It will be observed that this elaborate and carefully worded document sets forth all the essential circumstances under which

the contract was made between Grace Bros. & Co. and the master as fully as the record in this case does. The disaster, the seeking a port of refuge, the survey, the repairs to the ship, the handling of the cargo, the necessity of lightening the Andrew Johnson to enable her to complete her voyage, the transshipment of about 1,200 tons of cargo to the Leslie, the inability of the master to raise the money to pay expenses,—all these are fully disclosed by the instrument itself, and the other evidence in the case adds nothing to our information as to the situation existing when the bargain was made. The bond is clearly expressed, and free from any ambiguity. The words "said vessel," wherever they are used, from the beginning to the end of the bond, refer grammatically and logically to the Andrew Johnson, and to her only. To hold that the last paragraph should read, "Or if, during said voyage, an utter loss of both of said vessels * * * shall unavoidably happen," etc., would not be construction, but alteration, of its language. It is not the function of the court to make changes in a written instrument which is apparently deliberately agreed upon, and which unambiguously expresses in plain language a definite meaning (Dumont v. U. S., 98 U. S. 142), where there is no suit to reform the instrument, no evidence of mistake, no proof tending to show that words or phrases contained in it are used with special meaning. Interpretation according to intent is not to be resorted to when the document itself suggests no ambiguity, when it covers the whole subject-matter of the contract between the parties, and when there is no proof of any intent contrary to that expressed upon its face.

The arbitrators assumed, wholly without proof, that the contracting parties had carelessly employed some form of bond which happened to be at hand. They and the district court reached the conclusion that the real intention of the parties was that repayment of the money loaned should be contingent upon the safety of either vessel. The only reasons advanced for such a conclusion are that bottomry bonds are to be construed favorably to the lender; that they (the arbitrators and the district judge) find it inconceivable that the parties should have embraced the transshipped cargo in the bond without intending it to answer for the bottomry loan if the Leslie arrived safely, although the Johnson were lost; and that the cargo on the Leslie ought not to wholly escape if the Johnson were lost, since a part, at least, of the bottomry debt represented general average, which the cargo ought to pay. The answer to all these suggestions is that they are mere inference and assumption, unsupported by proof, as to the intention of an experienced business man in a distant quarter of the globe, who has expressed his intention, in plain English, the other way, and who must, in the absence of proof, be assumed to be intelligent enough to understand the meaning of the words he used, and sufficiently appreciative of his own business interests to see to it that the contract he made was the best contract he could get. When the firm of Grace Bros. & Co. expressly state, in careful phraseology, that they lend their money, and "are contented to stand to and bear

the risk, hazard, and adventure thereof upon the hull, body, or keel of the *said vessel* Andrew Johnson, her boats, tackle, apparel, and furniture, together with the cargo laden on board as aforesaid [the Johnson's cargo is uniformly referred to in the bond as "cargo laden on board"; the Leslie's, as "cargo transshipped] and the freight to be earned and become due," it will not do to hold, without proof, that they meant to stand to and bear a very different risk. Moreover, for the risk they took, as it is stated in the bond, viz. the loss of their loan if the Johnson became an utter loss, they charged a premium of $17\frac{1}{2}$ per cent. But if they staked their loan on the safe voyage of either vessel, so that they could lose nothing unless both vessels met with disaster, manifestly their risk was far less; and who in Hamburg or New York can say whether the parties intended to pay a like premium of $17\frac{1}{2}$ per cent. for such a risk? If courts thus, of their own motion, and without proof of mistake or of intent, reform mercantile contracts as clearly expressed as this, no business man can feel any confidence that his most careful choice of words will insure a construction of his agreement accordant to his own expressed intention, or otherwise than as the court may think such intention was, or ought to have been. We are of opinion, therefore, that the bond became void upon the sinking of the Andrew Johnson with her cargo, and not thereafter enforceable against the 1,130 tons transshipped to the Leslie, and that the payment of the bond by the consignee of that 1,130 tons was voluntary, and gave the cargo owner no right to call upon the owner of the Johnson for the repayment of any part thereof. The proposition that the 1,130 tons on the Leslie is to be treated "like any salvage from the wreck of the Johnson, precisely as if it had been rescued by the Leslie from the Johnson a few moments before the latter went down in mid ocean," and that it therefore remained subject to the bottomry lien after the Johnson went down is overstrained. In no possible sense was the 1,130 tons salvage of the "cargo laden on board" the Johnson on the voyage of that ship from Callao to Hamburg, which was the voyage on whose safe termination the bottomry lender staked his money.

It is not necessary to discuss the question whether a bottomry bond covers salvage, when it is a full and formal instrument, and contains no saving clause reserving to the lenders, in case of utter loss, any average that might be secured upon all salvage recoverable,—a clause which is usual in such full and formal instruments (Insurance Co. v. Gossler, 96 U. S. 645), since there has been no salvage either of cargo or ship in this case. The damages recoverable against the delinquent vessel which sent the Andrew Johnson and her entire cargo to the bottom are certainly not salvage. It may be that the bondholder, in the event of an utter loss which made his bond void, would have a direct claim against the offending vessel for damages caused to him by the destruction of property in which he had an interest superior to the owner's, and that when the offending vessel had made restitution in money for such destruction, in whole or in part, and the amount thus paid has come to the hands of the owner, the bondholder can sustain an

action against him for money had and received. Smith v. Williams, 2 Caines, Cas. 110; Read v. Insurance Co., 3 Sandf. 54; Watson v. Insurance Co., 3 Wash. C. C. 1, Fed. Cas. No. 17,286; Appleton v. Crowninshield, 3 Mass. 448; Id., 8 Mass. 358; The Empusa, 5 Prob. Div. 6. The bondholder recovers in such a case, however, not upon any theory that his bond survives as an obligation enforceable against the fund, as the representative of the ship. No doubt, damages recovered for the tortious act of a colliding vessel are often treated in admiralty as a substitute for the destroyed vessel. But the hazard taken by the bottomry bondholder is the physical survival of the ship, or, at most, of any salvage from her. When she goes to the bottom with all she holds, there is an utter loss, within the meaning of the contract of bottomry, and the bond goes down with the vessel. Recovery by the bondholder, under such circumstances, is, as above stated, either against the offending vessel, for destroying the property interest which the bond gave him, or against the person who has, without right, appropriated his share of the damages. But that is not this case. Libelants are not suing, as assignees of the bondholder, to recover damages for the destruction of the bond, either from the person or thing responsible for such destruction, or from the respondent, as having received those damages to the use of the bondholder. The whole action is based upon the theory that libelants paid the bond as an obligation they were bound to pay, and now ask to be repaid the proportion due under the bond from respondent. As the record shows that by the happening of the contingency upon which the loan was hazarded the bond became wholly void, libelants were under no obligation to pay it, and, having paid it, can claim nothing under it from respondent. The decree of the district court is reversed, with costs of both courts.